**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OILMAR CO., LTD, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:03-CV-1121 (JCH) |
| v. | : | |
| | : | |
| ENERGY TRANSPORT LTD and | : | OCTOBER 6, 2014 |
| P.T. CABOT INDONESIA, | : | |
| Defendants. | : | |

**RULING RE: PLAINTIFF'S MOTION TO VACATE FINAL ARBITRATION AWARD
ISSUED IN FAVOR OF P.T. CABOT INDONESIA AND ENERGY TRANSPORT
LIMITED. (Doc. No. 198)**

## I.    INTRODUCTION

Plaintiff Oilmar Co., Ltd. ("Oilmar") has moved to vacate the arbitration award

issued in favor of defendants P.T. Cabot Indonesia and Energy Transport Limited

(collectively "Cabot").  Notice of Motion of Oilmar Co. Ltd. to Vacate Final Arbitration

Award Issued in Favor of P.T. Cabot Indonesia and Energy Transport Limited ("Motion")

(Doc. No. 198).  Cabot opposes the Motion, and also requests that the court confirm the

Final Award in its entirety and enter Judgment in favor of Cabot, and that the court grant

its request for attorney's fees pursuant to 28 U.S.C. § 1987.  Memorandum of Law in

Opposition to Oilmar's Memorandum of Law on the Issue of Venue and in Opposition to

Oilmar's Motion to Vacate Final Arbitration Award ("Def.'s Opp.") (Doc. No. 203).[1]

Oilmar filed a Reply on September 24, 2014.  Reply Memorandum of Law in Further

Support of Defendant Oilmar Co. Ltd.'s Motion to Vacate Final Arbitration Awards

Issued in Favor of P.T. Cabot Indonesia and Energy Transport Limited ("Pl.'s Reply")

(Doc. No. 204).

---

[1] Given that Oilmar had the opportunity to reply, the court will treat Cabot's Opposition (Doc. No. 203) in part as a Motion to Confirm the Final Arbitration Award.

For the reasons set forth below, the Motion to Vacate Final Arbitration Award is **DENIED**. Cabot's Motion to Confirm the Final Arbitration Award is **GRANTED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In 2003, the tanker vessel San Sebastian ("Vessel"), owned by Oilmar and managed by Oilmar's agent, Antares Naviara S.A. ("Antares"), suffered a fire and explosion resulting in damage to cargo aboard the Vessel owned by Cabot. At the time of the casualty, the Vessel was carrying a cargo of carbon black feedstock, a low-grade fuel oil residue used for industrial purposes, pursuant, in part, to a bill of lading for carriage to Cabot's production facilities in Indonesia.

The fire was caused by on-deck welding ("hot work") undertaken by a fitter in the Vessel's crew on the Vessel's inert gas system ("IGS"). The IGS injected non-combustible vapor into the cargo tanks to prevent ignition of flammable cargo. The welding work allowed combustible air to enter a cargo hold and caused a vapor explosion and fire which killed three crew members, including the fitter, and also caused extensive damage to the ship and its cargo.

Subsequent to the explosion, Cabot and various other parties brought suit against the San Sebastian and Oilmar in this court and others seeking maritime attachments under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. In this court, the attachments were upheld, see Oilmar Co. v. Energy Transp., Ltd., No. 3:03-CV-1121, 2003 U.S. Dist. LEXIS 14350, at *10 (D. Conn. Aug. 18, 2003), and attached funds in the amount of $2,134,400.00 were transferred to the court's registry, where they currently remain.

Following a court order of arbitration of Cabot's claims against Oilmar, see Energy Transport, Ltd., and P.T. Cabot Indonesia v. M.V. San Sebastian, 348 F. Supp.

2d 186, 204-06 (S.D.N.Y. 2004), arbitration began in 2006.  The Arbitration Panel ("Panel") heard evidence from nine witnesses over the course of twenty hearings between June 21, 2006 and October 21, 2011.  The Panel also considered, over Oilmar's objections, notes taken by one of Oilmar's attorneys concerning his interview with the master of the Vessel shortly after the casualty and other members of the Vessel's crew and testimony of Denys Rebomizo, a Ukrainian attorney retained by Cabot, who interviewed one of the Vessel's surviving fitters.

On June 12, 2013, the Panel issued its Partial Final Liability Award and Final Demurrage Award, with the panel majority finding in favor of Cabot and the panel Chairman dissenting.  On August 19, 2014, the Panel issued its Final Award on Quantum of Damages ("Final Award"), which incorporated by reference the Partial Final Liability Award.  Motion, Exh. A (Doc. No. 198-2).[2]

## III.   JURISDICTION AND VENUE

Because, inter alia, the order compelling the arbitration, the award of which is the subject of the Motion pending before this court, was issued by the United States District Court in the Southern District of New York (Leisure, J), the court sua sponte raised the issue of jurisdiction and venue.  For the reasons that follow, the court concludes it has

---

[2] Oilmar originally filed a Motion to Vacate on September 12, 2013, following the issuance of the Partial Final Liability Award.  Motion to Reopen Case and to Vacate the Arbitration Award in Favor of P.T. Cabot Indonesia ("First Motion") (Doc. No. 185).  Following the issuance of the Final Award on Quantum of Damages, Oilmar filed the Motion to Vacate currently under review, and the court terminated the first Motion in light of the Motion to Vacate the full award.  (Doc. No. 203).  In doing so, the court stated that all arguments set forth by the parties in Oilmar's Memorandum in Support of Motion to Vacate the Partial Final Arbitration Award ("Pl.'s Mem. re: First Motion") (Doc. No. 187), Cabot's Memorandum of Law in Opposition to Motion to Vacate Partial Final Arbitration Award ("Def.'s Opp. re: First Motion) (Doc. No. 191), and Oilmar's Reply Memorandum of Law in Further Support of Motion to Vacate the Partial Final Arbitration Award ("Pl.'s Reply re: First Motion") (Doc. No. 194), which referred to the original motion, would be considered in connection with the new Motion to Vacate.

subject matter jurisdiction, and venue is either proper or any objection to it has been waived.

      A.    <u>Jurisdiction</u>

Subject-matter jurisdiction is conferred by section 203 of title 9 of the United States Code, which provides federal jurisdiction over actions to confirm or vacate an arbitration award governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  The New York Convention applies to arbitral awards "not considered as domestic awards in the State where their recognition and enforcement are sought."  Convention, Art. I.  The Convention applies here because Oilmar is a corporation based in Panama.  <u>See</u>, <u>e.g.</u>, <u>Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.</u>, 668 F. 3d 60 (2d Cir. 2012); <u>Pike v. Freeman</u>, 266 F. 3d 78, 85 n.4 (2d Cir. 2001).  Because the Final Arbitration Award was entered in the United States, however, "the domestic provisions of the FAA also apply, as is permitted by Articles V(1)(e) and V(2) of the New York Convention."  <u>Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.</u>, 668 F. 3d at 71.

Although Cabot does not contest the court's jurisdiction, it submits that Chapter 2 of the FAA, which incorporates the New York Convention, does not apply to this case because the arbitration was held and decided "wholly within the United States."[3]  Def.'s Mem. at 3-4.  However, an award granted in the United States may be considered non-domestic for the purposes of the Convention, where the dispute is not "entirely domestic

---

[3] In support of this assertion, Cabot cites only to the statutory title of "The Recognition and Enforcement of Foreign Arbitral Awards," emphasizing the "foreign," but provides no support in the case law interpreting the statute.  In fact, the case law wholly contradicts the claim that the New York Convention cannot apply to an arbitration held and decided within the United States.

in scope." See, e.g., Zeiler v. Deitsch, 500 F. 3d 157, 164 (2d Cir. 2007) (commercial dispute between United States and Israeli parties under Hebrew law fell under the New York Convention even though arbitration took place in New York); Pike v. Freeman, 266 F. 3d 78, 85 n. 4 (2d Cir. 2001) (Sotomayor, J.) (reiterating standard that the dispute not be "entirely domestic in scope"); F. Hoffman-La Roche Ltd. v. Qiagen Gaithersburg, Inc., 730 F. Supp. 2d 318, 325 (S.D.N.Y. 2010) (finding arbitration fell under the New York Convention where the underlying dispute related to patents with coverage "clearly beyond the borders of the United States," even though three of the four parties were American and arbitration took place in New York).

In addition to section 203 of title 9, the court further notes that while section 10 of title 9 does not independently confer subject matter jurisdiction on the federal courts, there is an independent basis of subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1).  Thus, the court concludes that it has subject matter jurisdiction to decide the case before it.  Further, Cabot did not contest personal jurisdiction in response to the first Motion, and explicitly does not contest jurisdiction now in its Opposition.  Thus, the court considers any objection to personal jurisdiction waived.

B.    Venue

Cabot attacks Oilmar's Motion on the grounds that the District of Connecticut is not the proper venue for adjudication of the Motion.  Def.'s Opp. at 2-4.  Oilmar argues that Cabot has waived its right to challenge venue and, that even if not, venue is appropriate.  Pl.'s Reply at 2-6.

Section 10 of title 9 of the United States Code states that ". . . the United States court in and for the district wherein the award was made may make an order vacating

the award . . . ." 9 U.S.C. §10.  As held in the Supreme Court's decision in Cortez Byrd

Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193 (2000), this venue provision is

permissive.  Id. at 204.  Both parties acknowledge this. Memorandum of Law in Support

of Motion to Vacate Final Arbitration Award Issued in Favor of P.T. Cabot Indonesia and

Energy Transport Limited ("Pl.'s Memo.") (Doc. No. 198-1) at 10; Def.'s Opp. at 3.

Thus, motions to vacate an arbitration award under the FAA may be brought "where the

award was made or in any district proper under the general venue statute [28 U.S.C. §

1391(b)(2)]."  Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193, 195

(2000).  Section 1391(b)(2) of title 28 of the United States Code  permits a civil action to

be brought in "a judicial district in which . . . a substantial part of property that is the

subject of the action is situated."  28 U.S.C. § 1391(b)(2).  In its opposition to Oilmar's

first Motion, Cabot noted that "[t]he only nexus to the District of Connecticut is the fact

that Cabot and ETL successfully attached Oilmar's property here, and that money

remains on deposit in the Court's registry as security for PT Cabot's and ETL's claims in

the underlying arbitration."  Def.'s Opp. re: First Motion at 1.  That attachment was

upheld subsequent to suits filed in this court by Cabot and other parties to the bills of

lading against Oilmar.  See Pl.'s Mem. re: First Motion at 4, 4 n.2 (listing cases against

Oilmar); Oilmar Co. v. Energy Transp., Ltd, No. 3:03-CV-1121 (CFD), 2003 WL

21976599 (D. Conn. Aug. 18, 2003).  Further, this attachment is central to the award

that Oilmar now seeks to vacate and, in amount, represents more than (approximately)

75% of the Award.  Pl.'s Reply at 5; Motion Exh. A (Doc. No. 198-2) at 13.  Hence, it

appears to be a sufficient basis for Oilmar's choice to move to vacate the award in this

District.  Cabot provides no legal basis for why this should not be so, other than an

assertion that venue would be proper in the Southern District of New York, where the arbitration took place.

Cabot argues that, "[w]hile <u>Cortez</u> makes clear that venue may also be proper elsewhere, it does not alter the conclusion that, in this case, venue is proper in the Southern District of New York." Def.'s Opp. at 3. However, even if venue would also be proper in the Southern District of New York, it does not follow from this conclusion that venue is improper in the District of Connecticut.[4]   Nor does Judge Leisure's 2004 directive to the parties to "return to this Court, if necessary, for the purpose of resolving any unsettled claims" upon completion of arbitration, <u>Energy Transp. Ltd., et al. v. San Sebastian, et al.</u>, 348 F. Supp. 2d 186, 208 (S.D.N.Y. 2004), prevent this court from having venue over a motion to vacate the arbitration award, where venue is otherwise proper. Venue is thus proper here.[5]

Oilmar also submits that Cabot has waived its right to challenge venue both by its failure to submit a timely objection and by engaging in conduct that constituted an implicit waiver.[6]  Pl.'s Reply at 2-4. On the first issue, Oilmar argues that Cabot did not

---

[4] Cabot's reference to the principle of "deference to the Court of first filing" set forth in <u>Cortez</u> is also misguided. Def.'s Opp. at 3. In <u>Cortez</u>, deference to the court of first filing was appropriate where motions to vacate or confirm the award had been filed in two separate district courts, even though the second motion filed was filed in the district where the arbitration award was made. <u>Cortez</u>, 529 U.S. at 196. Here, the court is unaware of any motions to vacate or confirm the award having been filed outside of the District of Connecticut.

[5] The court further notes that venue is proper under section 204 of title 9 of the United States Code, which states that an action to which the New York Convention applies "may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought . . . ."   Because venue is proper under both chapter 1 and chapter 2 of the FAA, they are not "in conflict" and thus both apply. 9 U.S.C. § 208.

[6] On the first issue, Oilmar argues that Cabot did not raise the issue of venue until the court asked for supplemental briefing, which took place after Oilmar's first motion to vacate was fully briefed, and well after the original action seeking attachment was filed in 2003. Pl.'s Reply at 3. On the second issue, Oilmar argues that Cabot's affirmative requests to the court to confirm the awards and enter judgment in response to both of Oilmar's motions constitute a "clear waiver of [Cabot's] right to challenge venue." <u>Id.</u> at 4.

raise the issue of venue until the court asked for supplemental briefing, which took place after Oilmar's first motion to vacate was fully briefed, and well after the original action seeking attachment was filed in 2003.  Pl.'s Reply at 3.  On the second issue, Oilmar argues that Cabot's affirmative requests to the court to confirm the awards and enter judgment in response to both of Oilmar's motions constitute a "clear waiver of [Cabot's] right to challenge venue."  Id. at 4.  The court does note that Cabot did, albeit not an objection, raise the issue in its response to Oilmar's first Motion to Vacate.  Def.'s Opp. re: First Motion at 1 (stating that "[w]hy Oilmar chose the District of Connecticut to file its tardy motion is questionable" and noting the arbitration's connections to New York).

Oilmar is correct that a party may implicitly waive the right to challenge venue based on its conduct. Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund, 967 F.2d 688, 692 (1st Cir. 1992) (citing Neirbo Co. v. Bethlehem Shipbuilders Corp., 308 U.S. 165, 168 (1939)).  As noted by Oilmar, Cabot has sought affirmative relief from the court in both its opposition to the first motion and its opposition to the current motion.  Pl.'s Reply at 4.  The court concludes that, even if venue is not proper in the District of Connecticut, Cabot's conduct constituted a waiver.

## IV.   STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") allows vacatur of an arbitral award:

1) where the award was procured by corruption, fraud, or undue means;

2) where there was evident partiality or corruption in the arbitrators, or either of them;

3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and

8

> material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> 4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.

The Second Circuit has also recognized that a district court may vacate an arbitral award that "exhibits a 'manifest disregard' of the law."[7] Stolt-Nielsen S.A. v. AnimalFeeds Intern. Corp., 548 F.3d 86, 91 (2d Cir. 2008), rev'd on other grounds Stolt-Nielsen S.A. et al. v. AnimalFeeds Intern. Corp., 559 U.S. 662 (2010). The "manifest disregard" doctrine permits a reviewing court to vacate an arbitral award "only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc. 592 F.3d 329, 339 (2d Cir. 2010) (internal citation and quotation marks omitted). "Manifest disregard" requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997) (internal quotation marks omitted). "[E]ven a barely colorable justification for the outcome reached" will preclude a finding of manifest disregard. Id. at 13 (internal

---

[7] Cabot asserts that the "vitality of [the manifest disregard] doctrine has been seriously called into question" in light of the Supreme Court's holding in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 128 S.Ct. 1396 (2008). Def.'s Opp. at 3. The Second Circuit in Stolt-Neilsen S.A. v. AnimalFeeds Intern. Corp., 548 F.3d 85 (2d Cir. 2008) however, explicitly disavowed any suggestion that the doctrine had been abrogated by Hall Street Associates. Stolt-Neilsen, 548 F.3d at 93-95 (2d Cir. 2008), rev'd on other grounds Stolt-Nielsen S.A. et al. v. AnimalFeeds Intern. Corp., 559 U.S. 662 (2010). The Supreme Court, in reviewing the Second Circuit's decision in Stolt-Neilsen, declined to decide whether the doctrine survived Hall Street Associates. Stolt-Nielsen S.A., 559 U.S. at 672 n.3. The court, therefore, follows the current law in this Circuit in recognizing "manifest disregard" as a basis for vacatur.

quotation marks omitted).  Only if an arbitrator's decision "strains credulity or does not rise to the standard of barely colorable . . . a court may conclude that the arbitrator willfully flouted the governing law by refusing to apply it."  Stolt-Nielsen S.A., 548 F.3d at 92-93 (internal quotation marks omitted).

Determining whether an arbitral panel acted with "manifest disregard" of the law in returning an arbitral award entails a three-part inquiry.  First, the court must consider whether the law allegedly ignored was clear and explicitly applicable to the matter before the arbitrators.  Id. at 93.  "Misapplication of an ambiguous law does not constitute manifest disregard."  Id.  Second, the court must examine whether the law was actually improperly applied, and whether such improper application led to an erroneous outcome.  Id.  Where proper application of the law would yield the same result, where an arbitral award contains more than one plausible reading—one of which yields a legally correct justification for an outcome—or where explanation for the award is deficient or non-existent but a justifiable ground for the decision may be inferred from the factual record, the court cannot find manifest disregard.  Id.  Third, the court must determine whether the arbitrators' disregard of the law was knowing and intentional; such a determination is permissible "only if [the court] find[s] an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator."  Id.

## V.   DISCUSSION

### A.   Whether the First Motion Was Timely Filed

Cabot attacked Oilmar's first Motion to Vacate on the grounds that it was not timely served.  While this issue became moot following termination of the first Motion, the court nevertheless notes that this argument was without merit.  Section 12 of title 9

10

of the United States Code requires that notice of a motion to vacate an arbitral award be "served upon the adverse party of his attorney within three months after the award is filed or delivered."  9 U.S.C. § 12.  Cabot contends that the motion was served "one minute after midnight (12:01 a.m.) on September 13, 2013," id., and thus three months and one day after the award was delivered on June 12, 2013.

The docket and Notice of Electronic Filing, however, both show that the Motion was filed and electronically served on September 12, 2013 at 5:10 P.M.  Doc. No. 185; Pl.'s Reply re: First Motion, (Doc. No. 194) at Ex. M (Notice of Electronic Filing).   The first Motion, then, was timely served.  Clearly, the Notice of Motion (Doc. No. 198) seeking vacatur of the Final Award, which is what the court has under consideration, was timely filed: the Final Award was issued on August 19, 2014; the Notice of Motion was filed on August 20, 2014.

B.   Manifest Disregard

Because parties do not dispute that the laws applicable to the question of Oilmar's liability are the Fire Statute, section 30505 of title 46 of the United States Code, and the fire exemption to the Carriage of Goods by Sea Act ("COGSA"), section 30701 of title 46, the first prong of the manifest disregard inquiry is satisfied.  Pl.'s Mem. at 4; Def.'s Opp. re: First Motion at 8.

The dispute instead turns on the Panel's application of the Fire Statute and the COGSA fire exemption in its analysis of Oilmar's liability.  Oilmar argues that the Panel "failed to properly consider whether Antares, as shore based managers, had 'actual fault or privity' with any act of negligence which caused the casualty," and instead conducted a "due diligence" analysis.  Pl.'s Mem. re: First Motion at 21.  Oilmar also

11

contends that, in finding it liable, the Panel relied on "speculative, unreliable evidence and an impermissibly loose chain of causation analysis." Id.

The Fire Statute provides that, "[t]he owner of a vessel is not liable for loss or damage to merchandise on the vessel caused by a fire on the vessel unless the fire resulted from the <u>design or neglect of the owner</u>."  46 U.S.C. § 30504 (emphasis added).  The COGSA exempts the carrier for "loss or damage arising or resulting from . . . [f]ire, unless caused by the actual fault or privity of the carrier."  46 U.S.C. § 30701, note 2, § 4(2)(b).  The Fire Statute and COGSA fire exemption, then, shift the burden of proof for proving a carrier's liability for damages, if caused by fire, to the shipper. <u>Asbestos Corp. Ltd. v. Compagnie De Navigation Fraissinet et Cyprien Fabre</u>, 480 F.2d 669, 672-73 (2d Cir. 1973).

"Design or neglect of the owner" under the Fire Statute and "actual fault or privity" under the COGSA fire exemption are functionally equivalent.  <u>Asbestos Corp. Ltd. v. Compaignie De Nav. Fraissinet et Cyprien Fabre</u>, 345 F. Supp. 814, 821 (S.D.N.Y. 1972); <u>In re Ta Chi Nav. Corp., S.A.</u>, 677 F.2d 225, 228 (2d Cir. 1982).  "Neglect" is negligence; the owner of a vessel can be liable for damage caused by a fire only if the shipper shows that the owner caused the damage by "proving that a negligent act of the carrier caused the fire or that such an act prevented the fire's extinguishment."  <u>In re Ta Chi Nav. Corp.</u>, 677 F.2d at 228.  "Liability is measured by the known dangers to be guarded against, and if care according to the circumstances is wanting, the natural inference is that injury accrues from the known danger—it is caused by the lack of care." <u>The Doris Kellogg</u>, 18 F. Supp. 159, 167 (S.D.N.Y. 1937).

The owner of the vessel or, in the case of a corporate owner, its managing officers or agents, must be personally negligent to be subject to liability under the Fire Statute and the COGSA fire exemption.  Westinghouse Elec. Corp. v. M/V Leslie Lykes, 734 F.2d 199, 206-07 (5th Cir. 1984).  Negligence of the master, mariners, crew, or other subordinates "is not attributable to the owner under principles of respondeat superior."  Asbestos Corp. Ltd., 480 F.2d at 673 n.7; Consumers Import Co. v. Zosenjo, 320 U.S. 249, 252 (1943); Westinghouse, 734 F.2d at 206.

In the Panel's view, Antares management's failures in supervision were a "proximate cause of the explosion and fire" on the San Sebastian, and thus deprived Oilmar of the protections against liability created by the Fire Statute and COGSA fire exemption.   Declaration of Thomas H. Belknap in Support of Defendant Oilmar Co. Ltd.'s Motion to Vacate the Arbitration Award Issued in Favor of Plaintiff P.T. Cabot Indonesia ("Belknap Decl.") (Doc. No. 186), at Ex. F, 10 (Partial Final Liability Award and Final Demurrage Award Decision).  The Panel specifically determined that

> the risk of an explosion was a foreseeable result of Antares management's having allowed the Vessel to proceed from Gibraltar with officers in conscious ignorance of the properties of the cargo, IGS lines in urgent need of repair, extra fitters who were welding experts tasked to do repairs on an urgent basis, and, most importantly, no formal plan detailing the scope of work or the methodology and supervision to be employed.

Id. at 9.

The Panel reached this conclusion after finding, from the evidence before it, the following sequence of events.  First, the IGS was not operated during the voyage of the San Sebastian, based on an interview with Captain Mykhaylo Kabanov in the Attorney Notes that stated that he believed the IGS had not been operated for "a period of some

13

28 days." Id. at 5.  Second, during the voyage, Antares, through its Superintendent

Captain Horatio Ledesma, became aware that the IGS piping had been heavily

corroded and was in need of immediate repair, as revealed by Captain Kabanov's report

that he had shown Superintendent Ledesma the "heavy corrosion" of the IGS piping and

an email from Superintendent Ledesma, sent two days before the explosion, stating that

the fitters were being kept on the Vessel to finish repairing the IGS piping.  Id. at 7-8.

Lastly, no planning was done by or submitted to management in preparation for repair

of the IGS piping, despite Antares management's expectation that the piping would be

repaired during the voyage, as evidenced by the lack of any documentation or testimony

relating to any planning for the repairs before the Panel.  Id. at 8-9.

Nothing within the Panel's decision suggests that it improperly applied the Fire

Statute and COGSA fire exemption to the question of Oilmar's liability; nor does it reflect

any errors "so obvious [as to] be instantly perceived as such."  Stolt-Nielsen S.A., 548

F.3d at 93.  The crux of Oilmar's challenge to the Panel's decision is that the Panel

misapplied a "due diligence" standard to the facts before it when it should have applied

the negligence standard required by the Fire Statute and COGSA fire exemption.  Pl.'s

Mem. at 4; Pl.'s Mem. re: First Motion at 21-23.  Oilmar does not direct the court to a

specific source for the "due diligence" standard it claims the Panel improperly applied,

but, given the context, the standard is likely a reference to COGSA's exemption of a

vessel owner from liability for cargo damage "arising or resulting from unseaworthiness

unless caused by want of due diligence on the part of the carrier to make the ship

seaworthy," 46 U.S.C. § 1304(1), or for damages arising or resulting from "[l]atent

defects not discoverable by due diligence," id. § 1304(2)(p).  Oilmar is correct to note

that a carrier need not prove that it exercised "due diligence to provide a seaworthy ship" before it may avail itself of the Fire Statute and COGSA fire exemption.  Pl.'s Mem. re: First Motion at 20; see In re Ta Chi Nav., 677 F.2d at 229.  That is, the burden of proof of liability for damages resulting from a fire is placed upon the shipper at the outset; the carrier is not required to first make a showing of due diligence.  This burden-shifting, however, did not preclude the Panel from considering whether Antares had constructive knowledge that the IGS lines were in need of immediate repair in determining whether the fire and explosion on the San Sebastian was caused by Antares' negligence, as Oilmar appears to argue in stating that the Panel's assessment of what "Antares should have known . . . incorrectly subject[ed] Oilmar to a due diligence standard."  Pl.'s Mem. re: First Motion at 22.

Further, the notion that a "due diligence" standard is appreciably distinct from a negligence standard, such that the Panel could have improperly applied the former rather than the latter in its review of Oilmar's liability, is inconsistent with what courts have determined "due diligence" actually requires.  Due diligence "is essentially the same as exercising reasonably or ordinary care."  Yawata Iron & Steel Co., Ltd. v. Anthony Shipping Co., Ltd., 396 F.Supp. 619, 627 n.10 (S.D.N.Y. 1975), aff'd mem., 538 F.2d 317 (2d Cir. 1976); see also Holsatia Shipping Corp. v. Fidelity and Cas. Co. of New York, 535 F. Supp. 139, 145 n.48 (S.D.N.Y. 1982).  The standard for due diligence is "not merely what ship owners usually do, but what a reasonably prudent one would do—and not what he might do in another vessel but in this vessel under the particular circumstance here present."  Holsatia Shipping Corp., 535 F. Supp. at 145 (internal citation marks omitted).  Whether a defendant acted with "reasonable care"

under the circumstances is also a hallmark of the negligence standard, including in admiralty and maritime.  See Crowley v. Costa, 924 F. Supp. 2d 402, 415 (D. Conn. 2013); Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 170-71 (2d Cir. 1983).  Thus, the distinction between "due diligence" and "negligence" seems, to this court, more formal than substantive.  If a carrier is charged with liability for general cargo damage resulting from unseaworthiness, it is only liable if it failed to exercise reasonable care in making the vessel seaworthy.  If a carrier is charged with liability for cargo damage resulting from fire, it is only liable if the fire was caused by the carrier's failure to exercise reasonable care.

Regardless of whether the due diligence and negligence standards are meaningfully distinct, however, the court does not find that the Panel's consideration of whether Antares had reason to know that the IGS piping was in need of immediate repair, in assessing whether Antares acted with reasonable care in failing to create a supervisory plan for the hot work undertaken on the piping during the voyage, was improper.  The question of Antares' knowledge on this issue was critical to determining whether the risk of explosion and fire was reasonably foreseeable, and thus to whether Antares had a duty to exercise reasonable care in protecting against that risk that it negligently breached.  See Stanford v. Kuwait Airways Corp., 89 F.3d 117, 125 (2d Cir. 1996) ("In determining the existence of a duty, a court may examine the reasonable foreseeability of harm to the party injured.").

The Panel does appear to have misstated the role of foreseeability in negligence analysis, in suggesting that the question of whether negligence was a "proximate cause of the explosion" was informed by the foreseeability of a "general kind or type of risk, not

16

the precise chain of events leading to the particular injury in question."  Belknap Decl. at

Ex. F, 9.  "[T]here are two concepts of foreseeability, the one specific, the other general.

The first concerns the foreseeability of the specific injury the plaintiff suffered, and

focuses on whether the defendant's actions were a proximate cause of the harm.  The

second . . . concerns the general foreseeable risk which is crucial to determining the

existence of a duty . . . ."  Stanford, 89 F.3d at 125.  This misstatement of the law,

however, did not result in an erroneous finding of Oilmar's liability.  While the Panel

couched its discussion of proximate cause in language of "general" risk, it clearly found

that Antares' failure to plan for the supervision of the fitter's hot work, despite having

reason to know that the IGS was not operating during the voyage and that the hot work

would have to take place during the voyage, specifically caused the explosion and fire.

See Belknap Decl. at Ex. F, 9.  Accepting the Panel's factual findings as accurate, the

court cannot hold that the casual connection between Antares' failure of oversight and

the explosion and fire was "so tenuous . . . that what is claimed to be consequence is

only fortuity."  CSX Transp., Inc. v. McBride,131 S.Ct. 2630, 2646 (2011).  Thus,

Oilmar's claim that the Panel "manifestly ignored COGSA and the Fire Statute,"

because it cited two products liabilities cases for their discussion of general

foreseeability, is without merit.

Oilmar further argues that the Panel's decision was based on an "impermissibly

loose chain of causation analysis" and "speculative, unreliable evidence."  Pl.'s Mem. at

4-5; Pl.'s Mem. re: First Motion at 21.  The Panel's reasoning does not strike the court

as "impermissibly loose."  The Panel found that Antares had reason to know during the

voyage that the IGS, which injected non-combustible vapor into cargo tanks to prevent

17

the ignition of flammable cargo, was not operating; that Antares became aware that the IGS piping was in need of immediate repair; that Antares understood that repair to this piping would be done during the voyage; and that Antares failed to plan for the repair, resulting in the fitter's conduct of hot work on the IGS piping, which led to the escape of combustible air into the cargo hold that caused the explosion and fire.  The court cannot say that the Panel's basis for reaching its result was so tenuous as to constitute manifest disregard.

Further, the court does not find that the Panel's conclusions of fact were "speculative."  Oilmar objects to the Panel's crediting of the Attorney Notes and Rabomizo's testimony in finding that the Vessel's "officers [were] in conscious ignorance of the properties of the cargo," and that extra fitters had been "tasked to do repairs on an urgent basis," on the grounds that, as will be discussed further below, this evidence was unreliable.  Pl.'s Mem. re: First Motion at 21-23 (internal quotation marks omitted). Whether the evidence considered by the panel was reliable is a question of evidentiary weight; it does not transform the Panel's conclusions based on this evidence into mere speculation.

C.    Fundamental Fairness and Public Policy

Oilmar also requests that the Panel's Award be set aside because the Panel's use of the Attorney Notes—which were attorney work product, hearsay, not conducted in the first language of either the interviewer or interviewee, and not verbatim transcription of the interviews—and the "double-hearsay" testimony of Cabot's attorney, violated public policy and rendered the arbitration fundamentally unfair.  Pl.'s Mem. at 5; Pl.'s Mem. re: First Motion at 25-29.

18

An award may be vacated pursuant to section 10(c)(3) where an arbitration proceeding was "fundamentally unfair." Tempo Shain Corp. v. Bertek, Inc.,120 F.3d 16, 19-20 (2d Cir. 1997) (internal quotation marks omitted).  Further, "[a]rbitrators' determinations regarding admission of evidence are not open to review except where fundamental fairness is violated." McDaniel v. Bear Stearns & Co., Inc., 196 F. Supp. 2d 343, 350 (S.D.N.Y. 2002).  "An arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument." Tempo Shain, 120 F.3d at 20 (internal quotation marks omitted).  However, "[a]rbitrators are only required to hear proffered evidence that is 'pertinent and material,' and their determination of what is 'pertinent and material' will only be deemed erroneous if it deprives a party of a fundamentally fair arbitration process." McDaniel, 196 F. Supp. 2d at 350.

To refuse enforcement of an award on public policy grounds, "the public policy must be well defined and dominant, and must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Schwartz v. Merrill Lynch & Co., Inc., 665 F.3d 444, 452 (2d Cir. 2011) (internal quotation marks omitted).

That the Panel relied on hearsay testimony is alone not a basis for concluding that the arbitration was fundamentally unfair or a violation of public policy.  It is well-settled that arbitrators are not required to adhere to the Federal Rules of Evidence, including its proscription against admitting hearsay evidence.  See Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F. 3d 99, 107 (2d Cir. 2013) (arbitrators "need not follow all the niceties observed by the federal courts.") (internal citation and quotation marks omitted); Raiola v. Union Bank of Switzerland, LLC, 230 F.

Supp. 2d 355, 360 (S.D.N.Y. 2002).  Thus, Oilmar's reference to cases wherein attorney

investigation notes were found to be unreliable and inadmissible hearsay on summary

judgment or at trial, see Reply re: First Motion at 7, does not assist the court in

determining whether the Panel's use of such notes in an arbitration hearing was a

violation of public policy or fundamentally unfair.  For the same reason, the protection

the rule against hearsay in civil and criminal trials affords to litigants in permitting them

"to confront the witnesses against them and to test their credibility through cross-

examination," Pl.'s Mem. re: First Motion at 29; Pl.'s Mem. at 6, is not a basis for

concluding that the use of hearsay within an arbitration procedure was fundamentally

unfair or a violation of public policy.

Oilmar asserts that the Panel "parse[d] the Attorney Notes as if it was [sic] a

carefully drafted sworn affidavit," and that the Panel's decision to do so was

fundamentally improper because the Notes were of conversations not conducted in the

native language of either the interviewer or the interviewee, and were not verbatim

translations of the interviews themselves.  Pl.'s Mem. at 5; Pl.'s Mem. re: First Motion at

27-28.  In light of the lesser evidentiary standards imposed upon arbitration

proceedings, the Panel's obligation as arbitrators to hear all evidence "pertinent and

material to the controversy," and the fact (which Oilmar does not dispute) that the

Attorney Notes were the only source of a contemporaneous account of the explosion

and fire from witnesses available to the Panel, see Def.'s Opp. re: First Motion at 11-12,

its reliance on these Notes was not fundamentally unfair or violative of public policy.

Notably, Oilmar provides no examples of the Panel depriving it of an opportunity

to present its evidence or its arguments against liability.  Oilmar instead takes issue with

20

the Panel's weighing and crediting of certain evidence unfavorable to Oilmar.  See Pl.'s
Mem. re: First Motion at 25 (noting that, "perhaps most remarkably . . . the Panel
expressly credits the Attorney Notes over Oilmar's superintendent's sworn testimony");
id. (characterizing as "[p]articularly troubling" the Panel's omission of evidence
suggesting that Ledesma's inspection of the Vessel took only ten minutes); id. at 26
(noting that the Panel "completely ignored" an excerpt of the Attorney Notes that
reflected that the captain though the repairs to the IGS piping could be done without hot
work).  This court, however, is not empowered to "review the weight the arbitration
panel accorded conflicting evidence. . . . [or] question the credibility findings of the
arbitrator."  McDaniel, 196 F. Supp. 2d at 351 (internal quotation marks and citations
omitted).  Thus, it has no basis to find that the Panel's consideration of the Attorney
Notes or double-hearsay testimony was a violation of "fundamental fairness" or "public
policy."

     D.    Request to Confirm the Award

In addition to its request to deny Oilmar's Motion to Vacate, Cabot also requests
that the court confirm the Final Award.  Def.'s Opp. at 11.  Under the FAA, an arbitration
award should be confirmed unless it is vacated, modified, or corrected.  D.H. Blair &
Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d. Cir. 2006).  Further, under the Convention,
"the court shall confirm the award unless it finds one of the grounds for refusal or
deferral or recognition or enforcement of the award specified in the said Convention."
Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15 (2d Cir. 1997) (quoting
9 U.S.C. § 207). As set forth above, the court finds no reason to vacate, modify, or

refuse the Final Award.  Accordingly, Cabot's request to confirm the Final Award in its entirety is granted.

     E.    <u>Request for Attorneys' Fees</u>

Finally, Cabot requests that the court impose attorneys' fees pursuant to section 1927 of title 28 of the United States Code, on the ground that Oilmar's second Motion to Vacate following the Panel's issuance of the Final Award on Damages was unnecessary in light of its previous motion, and thus represented an unreasonable attempt to prolong the matter.  Def.'s Opp. at 11-13.  Oilmar argues that its second motion was necessary to ensure that any order vacating the Liability Award was equally applicable to the Panel's Final Award in the arbitration.  Pl.'s Reply at 9.  Under section 1927, the court may require an attorney to pay costs if he or she "so multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.  In order to do so, the court must find "clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes,"   <u>Agee v. Paramount Commc'ns, Inc.</u>, 114 F.3d 395, 398 (2d Cir. 1997), and "bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." <u>Enmon v. Prospect Capital Corp.</u>, 675 F.3d 138, 143 (2d Cir. 2012) (internal quotation marks and citations omitted).

    The court cannot conclude under this standard that Oilmar, in submitting its second motion, or otherwise in connection with its attempt to vacate the Award, acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." <u>F. Hoffmann-La Roche Ltd.</u>, 730 F. Supp. 2d at 332 (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45-46 (1991)).  Therefore, Cabot's request for attorney's fees is denied.

## VI.    CONCLUSION

For the aforementioned reasons, Oilmar's Motion to Vacate Final Arbitration Award (Doc. No. 198) is **DENIED**.  Cabot's request to confirm the Final Award (Doc. No. 203) is **GRANTED**.  Cabot's request for attorney's fees (Doc. No. 203) is **DENIED**.

 **SO ORDERED.**

Dated at New Haven, Connecticut this 6th day of October, 2014.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge